May it please the court. My name is Jason Zolot. I'm here on behalf of the appellant Skelgen Berisha. Substantial evidence of actual malice was discovered in this case. One need not view it in the light most favorable to petitioner or ignore common-sense credibility determinations in order to see it. It is manifest on the face of the record. Lawson falsified evidence of Berisha's involvement with AEY, misrepresented the provenance of his allegations, asked the colleague if he could lie about evidence of Berisha's involvement, and literally invented details of a corrupt late-night rendezvous between Berisha and U.S. government officials, including imaginary details down to the color of the cars they drove and the content of their license plates. Those fabrications are themselves sufficient evidence of actual malice to require submission to a clear evidence of actual malice is to be considered in the aggregate and state of mind may be proved with circumstantial evidence. The district court made no attempt at aggregate consideration of the evidence bearing upon Lawson and Simon and Schuster's recklessness. Moreover, the summary judgment standard does exist. It does require that doubts be resolved in the non-moving party's favor. It does require that genuine disputes and material facts be decided by jury, and it does forbid the district court from usurping credibility determinations. The summary judgment standard was ignored by the district court in this case. Yet even if the district court had not ignored direct contrary evidence cited in opposition to defendant's statement of facts, summary judgment was improper here because the record was incomplete. The lower court wrongfully refused access to critical evidence of actual malice. Hundreds of attorney-client privilege and denied petitioner the opportunity to depose witnesses who were cited the district court as corroborating sources. Any one of those grounds would suffice to reverse here, but even if all those grounds did not exist, the district court decision should not stand. The New York Times standard should not be applied to petitioner's claims as the record does not support the determination that Mr. Berisha is either a general or limited purpose public figure. In any event, the lower court never told us which designation it applies, and so if it pleases the court, I'd like to take up each of those grounds in turn. First, the issue of actual malice. I'm sorry, let me just ask you a question maybe to get you kind of going here. I mean, what about the case law that says, you know, where there are existing reports of fundamentally the same conduct, you know, that there is some protection against an actual malice allegation, and here you've got lots. I mean, you know, you've got two New York Times articles, a Rolling Stone article, an Al Jazeera report, New Republic, two books, none of which, so far as I understand, you've ever challenged. Oh, Your Honor, well, first of all, defendants position in this case has been rejected by other courts, namely that the reliance on the so-called reputable news organizations cannot constitute actual malice as a matter of law, but in this case, Lawson wasn't an uninvolved third party who lacked access to the facts behind the published reports. In this case, if Lawson had information, and he did have information to raise obvious doubts about those sources, he didn't rely on those news stories. He simply hid behind them. Now, the lower court and defendants, frankly, treat the prior reporting as though the details of that reporting do not matter. In this case, there were two types of so-called prior reporting. One, prior reporting concerning AUI, and two, prior reporting regarding an unrelated matter, Gerdetsch. With respect to AUI, the only content of the prior reporting concerning Berisha's alleged involvement with AUI was a single statement from Efrem Dibrolli, and so the quantity of the newspapers that repeated that statement was a single statement. Now, wouldn't we assume that each time, you know, sort of that allegation gets picked up and repeated, that these reputable news sources are dotting I's and crossing T's? Isn't that the point? Well, Your Honor, I would submit that at the time, first of all, there's a huge time lag here between when those allegations were made and when the book was published. Most of those reports come from 2008. Now, in 2008, Dibrolli, Packhouse, and Petrischi were not yet convicted of fraud. It was unclear in 2008 the scope of the fraud that they had committed. So, those sources had no reason to either credit or doubt Dibrolli's telephone call, and frankly, the fact that they didn't state it as a fact, but rather only published the contents of that conversation is further evidence that they were perhaps unsure at the time, but subsequent evidence shows that Dibrolli is utterly unreliable, and Lawson knew at the time that he published this book that his account was based on only Dibrolli's statement. Now, with respect to the other reporting regarding Gerdetsch, first, I'd like to say that the lower court refers to that being about corruption. The Gerdetsch tragedy was not about corruption. Counsel Judge O'Scanlan here, what about the leaked ambassador cables that indicate that Berisha was involved in the Gerdech matter as well? Well, I mean, in order to answer that question, I need to make a general point, and that general point is this. Gerdetsch had nothing to do with AUI. The only reason that Berisha was associated with Gerdetsch was the fact that Ili Pinari was involved in both AUI and Gerdetsch. Second, specifically with respect to the WikiLeaks cable, Your Honor, one, there was no evidence of authenticity of those cables. Two, Lawson himself testified that Hoja denied making the statement in those cables, but in any event, the even if Berisha was involved with Gerdetsch, and he was not, it is not the case that Ben Lawson has free reign to make allegations that he was involved in some other matter. Now, if the court has no additional questions on prior reporting, I'd like to turn to the attorney client privilege issues in this case. I think you're, I'm not sure, I'll ask our townkeeper, but I think you're about out of time, but you saved seven minutes for rebuttal. Counsel, your time has expired. Good afternoon, Your Honors, and good morning, Judge O'Scanlan. This is Elizabeth McNamara on behalf of the defendants and the appellees. Based on the undisputed and compelling record before it, the district court below found no evidence that any defendant published the challenge statements with knowledge of falsity or any serious doubts as to its accuracy, let alone the clear and compelling evidence required. The decision below was driven, as Your Honors have already indicated, by the fact that the gist of the challenge statements, that plaintiff was involved in corrupt Albanian arms deals and associated with mafia thugs, had been widely reported for about a decade before the book at issue was published. As the court below found, it was old news. The plaintiff never challenged these reports, the page one New York Times article, the damning Al Jazeera documentary, which included even parliamentary debates on plaintiff's role in corrupt arms deals, and that matter as well as the AEY matter, and those remained available at the time of publication. This wealth of previously reported news, coupled with the other reports as well, standing alone dictated the dismissal of the action, even before you got to Lawson's further reporting that only provided additional confirmation of the gist of the reports. And let me turn, if I may, to some of the arguments raised by my adversary, Mr. Berisha's counsel, about plaintiff's arguments. He notes that the prior report should not be credited because Lawson had reason to doubt Mr. DiVaroli. There's several flaws with this argument. The first is that primarily Mr. DiVaroli had been either was thought to be involved in fraud or had been convicted of fraud at the time these reports were published. That includes the New York Times article, where the whole point of the New York Times article was exposing the fraud of Mr. DiVaroli and his cohorts. Further, not all of these reports just relied on DiVaroli. The Al Jazeera documentary, for example, relies on phone records, notes, parliament debates, and as I mentioned earlier, the Al Jazeera documentary does not actually tie the Gurdjieff and the AEY corruption arms deals. Further, there were the two books that placed plaintiff at the exact meeting that is primarily challenged in this case. The plaintiff tries to rely on the Ninth Circuit decision in Flowers, but that's readily distinguishable, where there the defendants were actually involved in the events at issue and were alleged to have been responsible for the misrepresentations or the misleading statements. Here, clearly, the parties involved, including Mr. Lawson, had nothing to do with the events at issue at Gurdjieff or AEY. And further, the readers of the book were well informed that there was reasons to doubt Mr. DiVaroli, as well as possibly Mr. Packhouse and Mr. Podritsky. As this court found in Michaels v. New York Post, when the publication informs readers that they are not dealing with unimpeachable sources, that undermines actual malice rather than supports actual malice. So for that reason, that argument just doesn't stand. As well as, Your Honor, with regard to the public figure argument that the plaintiff has pressed, this is of course first was a question of law for the court below. And the undisputed evidence amply supported the finding that Mr. Berisha was at the very least a limited purpose public figure. He was a household name in Albania. Incredibly, the plaintiff submitted evidence that he had 100% name recognition. And there had been multiple stories in which he played the central role, allegedly, in the controversy regarding these corrupt iron steels. Even a front page article that called it political Hiroshima, that he was involved. And the plaintiff's primary argument on public figure is that he never sought this publicity. But as this court found in Rosanara, you can't prohibit publication or limit the standard based upon the plaintiff's desire to have reporting. When you're dealing with corruption, when you're dealing with crime, as I think the court said there very aptly, people like Mr. Berisha yearn for the shadows. And the Wells v. Liddy case that he seeks to rely on here I think is really not distinguishable from the position taken by the 11th Circuit where someone is central to a controversy and they have either consorted with corrupt people or the like. They can be involuntary public figures. I don't even think he's an involuntary public figure given that he had participated and actually encouraged the press to investigate the AEY matter. Now if I may turn briefly in my time to the attorney-client privilege unless the court has any questions on the actual malice. I don't. This is Beverly Martin. That's my question why in this very subject that you're trying to get to. This is the only thing that seems a little bit messy to me. If you could address this in your remarks. It looked like to me that at least for the attorney-client privilege, it was shared beyond the attorney-client relationship. But for the common interest, the idea that the parties anticipated litigation and so they were doing the investigation pursuant to that. But it looks like to me that from the time Chris Chevers, if I'm saying the name correctly, spoke up, which I don't think anybody really thought that Chris Chevers was going to sue the New York Times. And then, I mean, that was, Chevers spoke up I guess in June and then you get the letter from Mr. DiVaroli's counsel in October. So is there a period of time there where there really wasn't anticipation of litigation that would give way to a common interest privilege? Your Honor, the Chevers letter that I believe you're correct on the timing preceded the commencement of the legal review and the documents that were being compelled or attempted to be compelled. When did that start? I apologize. When did that start? That was in June I believe, Your Honor, before the commencement of the legal review. That was my question. When did the legal review begin? It began after the receipt of the Chevers letter. In fact, the affidavit from Mr. Karp, the editor who was the primary person overseeing this process, his affidavit confirms that the book was sent to have a legal review after the Chevers letter was received. And in fact, he confirms in his affidavit that even if one couldn't be sure whether he would or would not bring a suit, of course his letter did copy a counsel at the New York Times, but Mr. Karp affirmed in his affidavit that they take any such claim seriously and that it was reviewed and then turned over to outside counsel to do a legal review of the book, which commenced after the letter. But before October 9th, which is when Mr. Leveroli sent his letter, right? Yes, that's correct, Your Honor. That is correct. Your answer is, well, we were worried enough about the Chevers letter to initiate this legal review. Am I understanding your argument correctly? That is correct, Your Honor. I think whenever you get a legal claim letter, it would trigger such a legal review like this of the entire work to ensure that there were not legal risks. But the court can independently, the court below found on the attorney-client privilege on two separate grounds. They found that they were privileged under the traditional attorney-client privilege or the joint defense or common interest doctrine. And this court can affirm under either or both grounds. And we submit that there's simply no evidence that there was an abuse of discretion under either finding. Most certainly on the attorney-client privilege issue here. Can I ask you a quick question? This is Judge Newsom about the attorney-client privilege issue itself. I mean, so the bullseye of attorney-client privilege, I guess, is literally lawyer to client. So here, Rivlin to Simon & Schuster. And then up John says it extends beyond the corporate client to include the corporate client's employees. And then there are some cases that say, lower court cases that say, yeah, we'll go a little bit further beyond up John to include certain non-employees. But why is it that Lawson would qualify here under that sort of extension of the extension of the privilege? Thank you, Your Honor. Yes, let me address that. And I think it comes under as the court below found that the attorney-client privilege applies to communications with third parties where the disclosure is in furtherance of the rendition of the legal services. This was also found in the every penny counts and numerous other cases where the communications are really the third party has critical information that informs the legal analysis. And that the legal analysis would effectively be impossible or useless if they were not able to confer with the party. And here, that was found in I think most particularly on point in the time decision that we rely on extensively in our papers where the movie company was looking to the independent production company as well as the screenwriters, the same people who stood in the similar shoes of Mr. Lawson. And further informing this analysis here is that Lawson per his publishing agreement was required to cooperate fully with a legal review. And that's... So I guess your position is surely your position isn't that any communication in furtherance of the representation qualifies the privilege. That sounds like it could conceivably mean anything. And then you said if the person has critical information that seems to limit it a bit. And then you said something like if it's truly necessary and indispensable to the representation. And that seems to narrow it further. I mean is what you're really asking for in effect sort of a sui generis extension of Upjohn to include these, you know, maybe for media industry, the media industry only these sort of pre-release, pre-publication reviews? No, Your Honor. Not... I'm sorry. Is there another context in which this sort of extension of the extension as narrowed by you would apply? Your Honor... I'm worried about Pandora's box. You can tell I'm kind of worried about Pandora's box. Yes, I completely understand that. And I don't think that... Well, I appreciate your concern. I don't think there needs to be a Pandora's box issue here. This is not a book publisher exception. It's an exception or where you realize the reality of the real world today where many and many companies now deal with independent contractors and freelancers who may be the people who have the sole possession of the information at issue that can form the legal analysis. Just a minute warning. This is... This was recognized in In Re Beter by the Eighth Circuit where it said that when applying the attorney-client privilege to a corporation, it is appropriate to distinguish between those on the client's payroll. Rather, it's inappropriate to distinguish between those on the client's payroll and those who are instead employed as independent contractors. Where here, the evidence is indisputable that Mr. Lawson was in the sole possession of all the information regarding the sourcing. This was the same rationale that went into the Tyne decision. It was the same rationale that went into the Davis v. Coaster-Garver situation. And what... And I think as the court below aptly found, a contrary ruling would put Simon & Schuster in the untenable position of choosing between preserving the attorney-client privilege or ensuring it complied with the law. There was no way for the legal reviewer, the lawyer, to evaluate this multi-hundred page book independently without getting the information that Mr. Lawson solely possessed. So for that reason, we don't think this is a broad opening of a box, of a Pandora's box, but rather a very discrete area that we can envision in many corporations now as freelancers and independent contractors become the norm. And that to formally and rigidly apply the privilege would put corporations in jeopardy in being able to assess legal risk properly. Counsel, your time has expired. Thank you, Your Honors. We hope we ask the court to affirm the ruling on all grounds below. Thank you. Thank you. Your Honor, Lawson was not a client of Simon & Schuster, he was not an employee of Simon & Schuster, he wasn't an agent of Simon & Schuster, nor was he an independent contractor of Simon & Schuster. Lawson was a contractual counterparty. The overarching problem with both defendant's analysis and the lower court's analysis is that they cite various exceptions to the attorney-client privilege as rationale for why the communications ought to be privileged, but they don't satisfy any of their requirements. Even if we assumed, and I think that's in doubt, but even if we assumed that the achievers in the Rowley claim letters gave rise to legal review, and on the side, Your Honor, the declaration of Jonathan Karp, president of Simon & Schuster, said that the book would have been subject to legal review regardless. But even if that wasn't the case, the Common Legal Interest Doctrine requires that there be multiple parties represented by multiple attorneys. Lawson was never represented by counsel. It requires that they anticipate litigation. In this case, Your Honor, even if they anticipated litigation with respect to achievers, or to Rowley, it certainly shouldn't shield unrelated communications concerning Berisha. Counsel, I noticed that you have cited In re Beter, and you just heard Ms. McNamara's comment. What's your response? Your Honor, In re Beter was grounded upon the notion that the person was the functional equivalent of an employee. Essentially, that the person looks, smells, and acts like an employee. Subsequent cases, including Beter, also set forth standards for determining whether or not someone is the functional equivalent of an employee. In particular, the Energy Capital case. One of those factors is whether they possess decision-making authority on behalf of the company. Lawson possessed no decision-making authority on behalf of the company. In fact, the publishing agreement itself states that Simon & Schuster was under no obligation, no obligation whatsoever to publish the book. Second, Energy Capital says that in order for a person to be designated as a functional equivalent of an employee, they have to be implicated in the chain of command. Lawson was never within Simon & Schuster's chain of command. Third, Energy Capital and In re Beter both require that the person be responsible for corporate activity. The corporate activity that leads to liability. Again, Lawson was never responsible for corporate activity of Simon & Schuster in any way. He was a commercial counterpart. Now, Ms. McNamara cites time as a rationale for why this court should uphold the lower court's ruling. The time was more of a result than it was reasoning. It certainly wasn't based on Florida Statute 90.502 and it's in furtherance language. Rather, if it was based on common interest, it was simply wrongly decided. I think a better understanding of time is that the court was grasping at the functional equivalent of employee doctrine. And in that case, the company was in fact an independent contractor who was working at the direction of Warner Brothers. Now, with respect to a potential exception for the media industry under these circumstances, I would make two points. First, the Supreme Court has already foreclosed that route in Herbert v. Lando, rejecting an editorial process privilege as too great of an impediment to a plaintiff being able to establish actual malice. But even if that case didn't exist, Your Honor, publishing is not a special case. Under the rationale that Ms. McNamara puts forth, a car manufacturer, in their dealings with a third-party supplier, if they wanted to shield their communications with respect to, say, their due diligence on the effectiveness of an airbag or brakes, those communications could simply be shielded on that basis. I do not believe that Florida law, or New York law, or federal law, credences the extension of the attorney-contract privilege via contract. That's essentially what she's asking here. Now, if I may, I'd also like to address Lawson's so-called reliance on prior reporting. Lawson's fabrications alone are evidence that he doubted the prior reporting. He would not have felt it necessary to manufacture corroboration of Pogreski's claim if he had actually believed he had enough evidence. Further, elided in Ms. McNamara's presentation is the fact that Lawson falsified the actual source of the account itself. Lawson, in the book, writes that they learned from Pignari. No one ever told Lawson that they learned from Pignari. In fact, Lawson's only source, Pogreski, said on one occasion that he learned from DiVrolli, and on another occasion he learned from Trebizka, who learned from DiVrolli. Instead of taking the fact that Lawson knew that that sourcing was unlikely, instead of looking at Pogreski's inconsistency as a reason that he needed to seek further corroboration, he simply changed the sourcing of the allegation. Third, with respect to public figure, the record evidence in this case does not support the district court's holding. For one, under Gertz, Mr. Berisha is simply not a public figure. He has not assumed any role in society of a special prominence, and there's no record evidence in this case to say that he has. Second, with respect to limited purpose public figure, the court below failed to apply Sylvester. They failed to isolate the public controversy here at AUI, and then failed to examine his involvement in that controversy. Counsel, your time has expired. Thank you. Thank you. We appreciate the presentation, and the court will take the case under deliberation. Thank you very much, Your Honors. We appreciate your consideration. Thank you.